```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION


 3
        UNITED STATES OF AMERICA,       Case No. 5:18-cr-516 - 1
 4                                      Cleveland, Ohio
                 Plaintiff,
 5
            vs.                         THURSDAY, JUNE 13, 2019
 6
        LAINI A. WOODS,
 7
                   Defendant.
 8


 9
                    TRANSCRIPT OF SENTENCING PROCEEDINGS
10                  BEFORE THE HONORABLE JAMES S. GWIN
                       UNITED STATES DISTRICT JUDGE
11


12      APPEARANCES:


13      For the Government:       Mark S. Bennett,
                                  Justin Seabury Gould,
14                                Assistant United States Attorneys


15
        For the Defendant:        Darin Thompson,
16                                Assistant Federal Public Defender


17
        For Probation:            Bradley Fabian
18


19


20
        Chief Court Reporter:     Sarah E. Nageotte, RDR, CRR, CRC
21                                United States District Court
                                  801 West Superior Avenue
22                                Court Reporters 7-189
                                  Cleveland, Ohio 44113
23                                (216) 357-7186


24


25          Proceedings recorded by mechanical stenography, transcript
               produced with computer-aided transcription.
```

|   |   |
|---|---|
| 1 | (Proceedings commenced at 9:05 a.m.) |
| 2 | - - - |
| 3 | THE COURT:  We're here this morning on |
| 4 | 18-cr-516, United States versus Woods. |
| 09:05:15 5 | The case is here today for sentencing. |
| 6 | In this case, the Court will find the defendant guilty |
| 7 | of Count 1, in which she's charged with conspiring to |
| 8 | defraud the Government with respect to claims, in violation |
| 9 | of 18 United States Code Section 286. |
| 09:05:38 10 | And I'd ask Ms. Woods and Mr. Thompson to go to the |
| 11 | podium. |
| 12 | Ms. Woods, did you receive a copy of the presentence |
| 13 | report? |
| 14 | THE DEFENDANT:  Yes. |
| 09:05:58 15 | THE COURT:  Did you go through each paragraph |
| 16 | of the report? |
| 17 | THE DEFENDANT:  I'm sorry, Judge? |
| 18 | Can you -- |
| 19 | THE COURT:  Did you go through each paragraph |
| 09:06:06 20 | of the report? |
| 21 | THE DEFENDANT:  Yes. |
| 22 | THE COURT:  Are there any mistakes in the |
| 23 | report or do you raise any continuing objections to the |
| 24 | report? |
| 09:06:12 25 | THE DEFENDANT:  Yes. |

1        MR. THOMPSON:  The objections as noted, Your

2   Honor.

3        THE COURT:  And my best understanding is that

4   you raise an objection only to paragraph 32, which

09:06:36  5   recommends a two-level adjustment for the use of -- improper

6   use of identification documents in carrying out the fraud?

7        MR. THOMPSON:  Yes, Your Honor.

8      And the prior identification of those same individuals

9   as identity theft victims, yes.

09:06:55 10        THE COURT:  Let me ask the probation officer

11   or the investigator.

12      Paragraph 25 has a number of victims in the case or

13   people whose tax returns were filed, right?

14        PROBATION OFFICER:  Correct.

09:07:23 15        THE COURT:  There's a repetition on a number

16   of those.  For example, there's a D.D. who appears at least

17   three times.

18      Is that correct?

19        PROBATION OFFICER:  Yes.  I believe those were

09:07:50 20   different tax years.

21        THE COURT:  Okay.

22        PROBATION OFFICER:  I should have indicated

23   that.  I apologize.

24        THE COURT:  And there are some other names

09:07:58 25   that also appear.  There's an S.L. who in the second line

1    the refund amount is $5,758, and that S.L. also appears

2    about eight or nine lines below that with roughly a $6,500

3    refund.  And then appears two-thirds of the way down for a

4    $4,894 refund.

09:08:38  5         PROBATION OFFICER:  That's correct, Your

6    Honor.

7         Those were different -- they were different tax years.

8              THE COURT:  Okay.

9              PROBATION OFFICER:  I should have indicated

09:08:46  10   that in another section of the report.

11             THE COURT:  And it appears on the second page

12   as well, right, S.L.?

13             PROBATION OFFICER:  Correct.

14             THE COURT:  Okay.  And so, the investigation,

09:08:58  15   it sounds like the Government believes there's evidence that

16   even those persons who -- who provided identification

17   information for one tax year did not approve it for other

18   tax years?

19             MR. BENNETT:  Your Honor, in our interviews by

09:09:20  20   Special Agent -- IRS Special Agent Todd Whitesell, and in

21   trial prep, those witnesses did tell us that.  They did

22   provide us with that information.

23        As the Court is probably aware of the plea agreement,

24   we did not seek that additional enhancement.

09:09:37  25             THE COURT:  Well, in terms of the underlying

1    scheme, so these refunds were requested, right?

2              MR. BENNETT:  Yes.

3              THE COURT:  And you say they were fraudulent

4    by inflating the entitlement to the Earned Income Tax

09:09:54  5    Credit?

6              MR. BENNETT:  Yes, Your Honor.

7         Most of the individuals we spoke with suggested that

8    Ms. Woods in particular would ask them about their activity,

9    and if they did hair on the side, she might put that she --

09:10:07  10    they had a hair business and inflate the income that they

11    had received from that; or if they watched some children

12    here or there, she would set it up as if they had a daycare

13    business.  So they would have some level of a side business

14    that they were doing and then that inflated the income and

09:10:26  15    then the Earned Income Credit.

16              THE COURT:  Okay.  Paragraph -- take a look at

17    paragraph 24.

18              MR. BENNETT:  Of the PSR, Your Honor?

19              THE COURT:  Right.

09:10:36  20              MR. BENNETT:  Yes.

21              THE COURT:  So how was the payments directed?

22    How was the IRS directed to make payments?

23              MR. BENNETT:  Well, that was kind of Mr.

24    Mitchell's end of the scheme from what our investigation

09:10:48  25    determined, that Mr. Mitchell recruited other individuals to

1    open up these cards that were like the payday-type cards and

2    the IRS -- the tax return would be prepared as if the tax

3    filer was filing it themselves and then they would give --

4    instead of Ms. Woods -- and then they would give a bank

09:11:08  5    routing number that would go onto one of these kind of

6    prepaid cards.

7             THE COURT:  I guess what I'm really leading

8    to, and the Probation report's somewhat unclear, and,

9    specifically, paragraph 24, were these persons who the money

09:11:26  10   was directed to, were they the taxpayers whose -- or were

11   they third parties?

12            MR. BENNETT:  Well, it would -- it would look

13   like -- and the IRS doesn't necessarily care on that issue.

14   If they're told to send it to this bank routing number, they

09:11:44  15   don't double check to see if it's the actual tax filer or

16   it's another individual, so they would just be given a

17   routing number and they wouldn't know.

18        So, often, those cards were in other individuals'

19   names and those individuals were recruited by Mr. Mitchell

09:12:01  20   to open these accounts, have the money put on it, and then

21   Mr. Mitchell and that individual would go cash out the card.

22   Some of the money would go back to the tax filer, if they

23   were aware that Ms. Woods was preparing their tax return,

24   and then they would keep the rest of the money.

09:12:18  25            THE COURT:  So they would split it between the

1    person who had the bank account, the defendants in the case,

2    and with -- potentially with the taxpayer?

3              MR. BENNETT:  Well, the people that got the

4    bank account told us they were either paid a flat fee of,

09:12:32  5    like, $500, $100, I think it was, and some of them just did

6    it because Mr. Mitchell was a friend and he asked them to do

7    it.  So several of them denied ever receiving any benefit

8    from Mr. Mitchell or Ms. Woods.

9              THE COURT:  What's your information regarding

09:12:45 10    the -- there's, say, roughly 120,000.

11         How much went to the taxpayers?  How much went to the

12    persons facilitating the money transfer?  And how much went

13    to the defendants?

14              MR. BENNETT:  Well, I believe the way that the

09:13:03 15    chart is set up, it shows the refund amount of the 143,272,

16    and then I think we backed out for the accurate income, the

17    actual tax filer amount was the 128, so that's the reduction

18    there.

19         How much went to each individual tax filer, we have

09:13:25 20    not calculated that, Your Honor.  I couldn't -- I couldn't

21    tell you.

22              THE COURT:  What's your best sense of that?  I

23    mean, is the majority going to the defendants?  Is the

24    majority going to the taxpayer?  Is the majority going to

09:13:41 25    the person whose account was used?

1        MR. BENNETT:  The majority went to Ms. Woods,

2    from what we were told.

3        There were several individuals who came in and said:

4    Yes, I had her prepare my taxes for that year and I got a

09:13:56 5    refund.  So the refund amount may show up as 3,000 and they

6    would say that Ms. Woods gave them 1,000 or $1,500 in cash.

7        And then they claimed that they were unaware two or

8    three years later that she used their name again for the

9    second and a third year, and they got no -- no amount of the

09:14:15 10   tax refund.

11       So if you're breaking it down, I guess probably a

12   third of it went back to the tax filers and then roughly

13   two-thirds would have gone to Ms. Woods.  And how Ms. Woods

14   and Mr. Mitchell split the money, I have no knowledge.

09:14:29 15           THE COURT:  And then, relative to the person

16   whose accounts were used to receive the refunds, how many

17   were there?  Were there separate persons for each refund or

18   were there a limited universe of people whose accounts were

19   used?

09:14:47 20           MR. BENNETT:  There were approximately three

21   to four individuals that were used repetitively; a friend of

22   Mr. Mitchell's, a couple ex-girlfriend's of Mr. Mitchell's,

23   so -- and, again, they were paid very little.

24           THE COURT:  Okay.  So what's the argument on

09:15:03 25   the identity two-level enhancement?

1          MR. THOMPSON:  For the defense, Your Honor?

2          THE COURT:  Yeah.

3          MR. THOMPSON:  Your Honor, throughout the

4    negotiation of the plea --

09:15:17  5          THE COURT:  And don't -- that's a loser.

6      So I -- you know, it's a (b)(1) -- or Rule 15, I don't

7    care what you negotiate with the Government.

8          MR. THOMPSON:  That's not the argument I was

9    about to make, Your Honor.

09:15:33 10      What I was just setting up was there's been two

11    different versions of events the entire time.

12      All right.  The Government's version of events, which

13    is that after they began interviewing the taxpayers, a

14    number of the taxpayers said:  No, no, we had no idea what

09:15:46 15    was going on, this is completely unexpected to us.  And

16    then, when confronted with evidence that they did get some

17    money:  Oh, yeah, like, well, we did.  Or they must have

18    known something.  Oh, yeah, we did get some portion of it,

19    but we only got a third.

09:16:02 20          THE COURT:  Why would -- why would the money

21    have been routed to third parties if the taxpayers knew that

22    their IDs were being used for a particular year?

23          MR. THOMPSON:  Your Honor, my understanding is

24    because some of these individuals didn't have bank accounts,

09:16:17 25    and I think also likely to, you know, try to avoid

1     detection.

2                    THE COURT:  To avoid what?

3                    MR. THOMPSON:  Detection in some way, to add

4     some layer of, you know --

09:16:28  5            THE COURT:  Well, if they filed the tax

6     returns, wouldn't they be detectable?

7                    MR. THOMPSON:  I agree it's not a great idea,

8     Your Honor, but I'm only speculating as to why it would be

9     done.

09:16:38 10        I do know that some of these same individuals, even

11    with third-party people, later indicated -- even with

12    third-party payers -- and not all of them did have

13    third-party payers, mind you -- but some of the ones even

14    with third-party payers did acknowledge that they knew that

09:16:50 15   she was filing taxes for them.

16        All right.  And for some of them, we have documents

17    showing that contact between them.  And some of them --

18                    THE COURT:  So --

19                    MR. THOMPSON:  They interviewed people who

09:16:59 20   indicated that they did have contact with her despite their

21    claims to the contrary.

22                    THE COURT:  Does the two-level enhancement

23    apply if there was even one whose ID was falsely used?

24                    MR. THOMPSON:  Would it apply?

09:17:10 25            THE COURT:  Yeah, if --

1              MR. THOMPSON:  If Your Honor found it?

2              THE COURT:  If at least one of the taxpayers

3        did not know she was using their ID for a subsequent year,

4        would the two-level enhancement apply?

09:17:27  5              MR. THOMPSON:  Yes.

6           But I would ask the Court to make a finding as to

7        which one so that I can provide some information to the

8        Court showing that that is not true.

9           And that is why I prefaced this portion of the -- of

09:17:39 10      the defense argument with the during plea negotiations,

11       there's been two separate sets of facts.

12              THE COURT:  Which -- for the Government,

13       which persons indicated that they had not known about

14       subsequent use of their IDs?

09:17:58 15              MR. BENNETT:  Your Honor, I'd be hard-pressed

16       to name all of them.

17           But I would say, in -- with regard to the negotiation

18       as to why, we did have listed S.L. and C.H. in Counts 2

19       through 5 and then the aggravated identity theft count that

09:18:17 20      came in, and when we did press them -- so to Mr. Thompson's

21       point -- they changed their story, which we were going to

22       have to dismiss those counts at trial anyways, because they

23       initially said they didn't know her at all, didn't know

24       anything about her, didn't give her the right to use their

09:18:34 25      ID.

1       And then, when we pressed them on it, they said: All

2  right, yes, I did know her. I did meet with her the one

3  year. But I didn't want to --

4                THE COURT: I asked a fairly simple question.

09:18:45  5                MR. BENNETT: Yes, Your Honor.

6                THE COURT: I don't know why you wouldn't just

7  answer the question.

8                MR. BENNETT: Well, because I don't know each

9  individual.

09:18:50 10       I do know, for instance, one individual by the name of

11  Crystal Powell came in and met with us, and she's legally

12  blind, and she had said that she did not -- she was going to

13  be one of our witnesses at trial -- that she did not know

14  Ms. Woods, she did not allow her to use her information to

09:19:09 15  file taxes.

16       But to go through each witness that we had and each

17  tax filer and say which one specifically said they gave her

18  the right one year and then she didn't have the right the

19  next year, I'd be hard-pressed to name each person for the

09:19:25 20  Court, so I apologize.

21                THE COURT: I didn't ask you to name each

22  person. I asked you to identity -- Mr. Thompson made the

23  argument that he can't -- he has difficulty responding if he

24  doesn't know who you mention or who you reply upon or who

09:19:41 25  the probation officer relies upon to say that at least one

1    of these taxpayers, even if they authorized the ID in

2    earlier years, did not authorize it for all the filings.

3              MR. BENNETT:  Yes, Your Honor.

4         And as we mentioned that -- the agent leaned over to

09:20:02  5    me when Mr. Thompson said that and suggested Crystal Powell

6    would be one individual that would fit that answer to that

7    question, Your Honor.

8              THE COURT:  Okay.  So what evidence do you

9    have that Crystal Powell knew that her ID was being used for

09:20:20  10    each of the filings?

11              MR. THOMPSON:  Your Honor, I could ask for a

12    continuance so that we can present the Court with evidence.

13    We can subpoena Ms. Powell in here.  Ms. Woods indicates she

14    knows Ms. Powell.  We can certainly address that.  But it's

09:20:33  15    a factual finding, we should flesh it out.

16              THE COURT:  Well, except this is, you know, a

17    sentencing hearing.  You knew the issue.

18              MR. THOMPSON:  I didn't know that Ms. Powell

19    was going to be identified as the person upon whom this

09:20:45  20    Court would be relying.

21              THE COURT:  Well, did you -- who else besides

22    Powell?

23                   (Pause in Proceedings)

24              MR. BENNETT:  Your Honor, again, we would --

09:21:03  25    we would need to take some time to go through the people we

1    spoke to, because, I mean, we spoke to, I don't know, 50

2    people.  I don't want to mislead the Court in any way and

3    provide false information.

4             THE COURT:  Okay.

09:21:19  5             MR. THOMPSON:  Your Honor, so, essentially,

6    the defense argument is that the evidence is just

7    insufficient to support that accusation and insufficient to

8    support that enhancement.  I believe that is reflected in

9    the plea agreement.

09:21:30 10        I understand the Court -- this Court is not bound by

11   that plea agreement.  I'm not suggesting that.  But I am

12   suggesting that in this case it does accurately reflect what

13   the evidence does as well with regard to whether or not the

14   Government has met their burden of proof that -- or whether

09:21:45 15   there is sufficient evidence for this Court to find.

16        I mean, at this point, we have an out-of-court

17   statement and we have -- Ms. Woods will tell you this

18   morning her relation to Ms. Powell, if Your Honor would

19   like.

09:21:57 20        I don't know if Your Honor would like me to proceed to

21   generalized statements.

22             THE COURT:  I'm also -- the circumstantial

23   evidence is something that I'm, you know, in part,

24   influenced by, and if -- and probably most specifically how

09:22:13 25   much money each of the taxpayers received from each of the

1    checks, so --

2              MR. THOMPSON:  Your Honor, so the record's

3    clear, Ms. Woods' position has been consistently that

4    neither she nor her co-defendant got the lion's share of

09:22:37  5    that money.

6         That's just -- again, there's been two sets of facts

7    kind of throughout this case.  Consistent has been -- you

8    know, what I think has been consistent is that, yes, she was

9    involved in this, but the degree between her and the

09:22:53 10    taxpayers and the way this dynamic played out is what's been

11    disputed.

12              THE COURT:  Do you have 302s from the people

13    whose accounts were used?

14              MR. BENNETT:  Yes, Your Honor.

09:23:06 15         We have interviewed both the people that the -- that

16    set up the third-party accounts in their name as well as the

17    tax filers.

18         Again, to Mr. Thompson's point, we have no way of

19    determining how much went, other than -- to the tax filer

09:23:26 20    versus to Ms. Woods, other than their information to us,

21    because it was cash that was taken out.  And then, how it

22    was divided up, we -- we were told by tax filers a certain

23    amount, but we have no way of --

24              THE COURT:  Well, do the -- do the persons

09:23:41 25    whose accounts were used -- you said there was two, three of

1      those people?

2                   MR. BENNETT:  There was more than that.  There

3      were two or three primaries that were there.  But, again,

4      those people did not get any money that we're aware of.  It

09:23:55  5      was the tax filers and then Ms. Woods kept a portion of the

6      funds.  The people that set up the bank accounts and got the

7      money out got 50 bucks or --

8                   THE COURT:  What do their statements -- do

9      their statements indicate they had any contact whatsoever

09:24:09 10      with the taxpayers?

11                   MR. BENNETT:  No.  No.  These were friends of

12      or associates of Mr. Mitchell and they were, in essence,

13      doing him a favor is what most of them told us.

14                   THE COURT:  Does your client have any kind of

09:24:23 15      checks where she wrote to the taxpayers or receipts from the

16      taxpayers showing that she gave the money to them after the

17      money was routed through these third-party accounts?

18                   MR. THOMPSON:  No, Your Honor.

19                   MR. BENNETT:  And that's consistent with

09:24:43 20      our -- with the testimony or the evidence that we had in the

21      302s was that it was always in cash, that Ms. Woods would

22      show up with an envelope with cash.

23           And, again, the reason we didn't pursue it -- and we

24      would ask the Court to agree with what the parties have, as

09:24:58 25      far as the loss amount and the guideline calculation in the

1    plea agreement -- is because we had those issues with

2    establishing that and we came to a number that we think

3    was -- was fair, that Ms. Woods agreed to as far as the loss

4    amount, and, again, we would ask the Court to use that

09:25:17   5    number in its sentencing today.

6                THE COURT:  Okay.  Maybe there's a

7    misunderstanding.

8         Under our system, I think judges are supposed to make

9    fair interpretations of the facts and then apply those facts

09:25:38  10    to the guidelines.

11         Attorneys and prosecutors are not supposed to make a

12    decision what they think is fair and pick a sentencing range

13    for the plea agreement that supports the prosecutor's

14    interpretation of what they think is fair after bargaining

09:26:02  15    with the defendant.

16                MR. BENNETT:  I guess I would disagree with

17    Your Honor in that regard.  We all have a role to play.  Our

18    role is to do what we can prove beyond a reasonable doubt.

19         And there were some issues with the tax filers being

09:26:16  20    able to show up, how they would hold up under

21    cross-examination, so we negotiated in good faith with the

22    defendant for an amount that we can prove.

23         We can prove this --

24                THE COURT:  But is -- well, you're talking

09:26:31  25    about two different things.

1          One is whether you would support a plea agreement.

2     The second is whether you would play with the guidelines to

3     secure a plea.

4                    MR. BENNETT:  Well, Your Honor, again, I would

09:26:48  5     disagree that we played with the guidelines.

6          I've been doing this for 13 years.  I've prosecuted

7     dozens of individuals.  And we always try --

8                    THE COURT:  Why in this case, if you've got at

9     least more than one of the taxpayers who indicated they

09:27:06 10     never knew about the use of their ID in subsequent years,

11     why would you agree that that doesn't apply?

12                    MR. BENNETT:  Well, I didn't object to it, so

13     I don't find fault with Probation for pursuing it, but we

14     negotiated that in good faith because, again, we had people

09:27:24 15     who were tax filers who were very difficult to find.  It

16     took weeks for us to track them down.  They made it clear

17     they didn't want to come and testify in court.  They -- we

18     would have to pick them up and bring them, if we could find

19     them again.  And they often changed their stories.

09:27:42 20          So I'm not going to put someone on the stand who is

21     going to perjure themselves simply to get an enhancement or

22     a conviction, so what I did is I negotiated for what I could

23     prove beyond a reasonable doubt, and that's what I could

24     prove beyond a reasonable doubt, which is what I understand

09:27:57 25     my job is.

1              I took an oath.  I swore --

2                     THE COURT:  Well --

3                     MR. BENNETT:  -- it.  And that's what I do for

4       a living, Your Honor.

09:28:01  5                     THE COURT:  Well, what's the standard for the

6       guideline calculation?

7                     MR. BENNETT:  It would be a preponderance of

8       the evidence, Your Honor.

9              And you would have a right to take hearsay and

09:28:08 10      statements from outside, either myself or letters that you

11      have received.

12                     THE COURT:  And in terms of the subsequent use

13      of the IDs, is that even an element of the underlying

14      conviction?

09:28:22 15                     MR. BENNETT:  No, Your Honor, not the one that

16      we've agreed to.

17              We had the tax fraud, there were wire fraud counts,

18      and then there were the aggravated identity counts, which we

19      have agreed to dismiss, 2 through 9.

09:28:35 20                     THE COURT:  Let me ask the probation officer.

21              You recommended their ought to be a two-level increase

22      for the use of the ID?

23                     PROBATION OFFICER:  Yes, Your Honor.

24                     THE COURT:  And from the quick paragraph, it

09:28:50 25      sounds like you believe that even if there was sufficient

1    evidence for the first tax years, there was subsequent uses

2    that indicated use of the IDs beyond the first year?

3              PROBATION OFFICER:  Correct.

4         I basically used the preponderance of the evidence.  I

09:29:11  5    thought the evidence supported that at least one individual,

6    that their ID was used without their knowledge.

7         And I was -- in reviewing the guidelines, it says,

8    basically, cases involving means of identification, it says:

9    Any individual whose means of identification was used

09:29:30 10    unlawfully or without authority.

11        So I think, just based on the fact that they were

12    using their identifications to file these fraudulent

13    returns, that would be enough.

14              THE COURT:  Do you have any final response?

09:29:47 15              MR. THOMPSON:  Only to note that, I mean, what

16    the probation officer has done is accept these out-of-court

17    statements as true.

18        All right.  As we've gone over in court, we put in our

19    sentencing memo, as the Government indicated, as I've

09:30:01 20    indicated, there's credibility problems with a number of

21    these people and there's real reasons to doubt the accuracy

22    of those statements that, oh, we had no idea what was going

23    on.

24              THE COURT:  Well, why would they -- why would

09:30:17 25    they authorize the use of their ID in subsequent years if

1      they weren't getting any money?

2                  MR. THOMPSON:  Because they were getting

3      money, Your Honor.

4                  THE COURT:  Well, what evidence shows that?

09:30:28  5        MR. THOMPSON:  My client will tell you that,

6      Your Honor.  That's what was happening here.

7          What was happening here is my client facilitated tax

8      fraud by a number of people in doing -- in filing these

9      things.

09:30:40 10                THE COURT:  Why would someone file a tax

11     return if they were getting a pittance of the --

12                 MR. THOMPSON:  And they weren't.  They were

13     getting more than a pittance.

14                 THE COURT:  Okay.  Well -- but aren't they --

09:30:50 15    they're the ones whose names were on the line, right?

16                 MR. THOMPSON:  Yeah.  They didn't think they

17     were going to get caught.  They thought this was -- they

18     were going to get away with it, that they would escape

19     because there were so many tax filings maybe the IRS

09:31:01 20    wouldn't check.  They thought that, all right, it's

21     believable enough and, you know, probably won't get in any

22     trouble.  Or if I do, it will just be like some kind of

23     civil trouble.

24         And when the IRS came calling, they said:  Oh, I had

09:31:15 25    no idea what was going on.  And then some of them, at least

1    when pushed, said:  Oh, wait, yeah, I did know that year,

2    but not later years, and I only got a small amount.  Your

3    Honor, these are self-serving statements.

4         These are -- I urge the Court, if Your Honor is really

09:31:27  5    considering this, put some of these people on the stand.

6    Let's give the defense a chance to show whether or not this

7    evidence meets a standard of preponderance.  The Government

8    is not advocating for it because it's -- that's a sensible

9    position.  And I don't think this Court is -- you know,

09:31:43 10   should be disregarding the Government's assessment of

11   whether or not something -- whether or not an enhancement is

12   supported by the evidence willy-nilly.

13              THE COURT:  So S.L. is, what, a home health

14   care worker?  Or is a home health aide?

09:32:01 15                  (Pause in Proceedings)

16              MR. THOMPSON:  I believe --

17              THE COURT:  Or a hair dresser?

18              MR. THOMPSON:  She was listed as a home health

19   aide on her first tax return, and I think later tax returns

09:32:27 20   gave a different -- one later tax return gave a different --

21              THE COURT:  She's listed on a later one as a

22   home health aide also.

23         Are you saying she doesn't have a bank account?

24              MR. BENNETT:  Your Honor, I can't state

09:32:49 25   whether these individuals have bank accounts or not.  I'm

1       telling you how the scheme ran.  As to whether or not they

2       actually had a bank account -- but the bank cards were set

3       up by Mr. Mitchell.

4                    THE COURT:  Well, if she had a bank account --

09:33:05  5   most home health aides you would assume would at least have

6       some bank account, right?

7                    MR. BENNETT:  We did have some people come in

8       and say that they had bank accounts.  There were a couple

9       that had the money go directly into their bank account the

09:33:21 10   first year, and then, the subsequent years, they were

11      unaware of the tax refund, didn't get a direct deposit, or

12      they told us that they questioned why not just have it go to

13      my bank account?  Why are you giving me cash?

14           But I can't tell Your Honor and the Court exactly

09:33:38 15   which individual that is without reviewing all the 302s that

16      we have or analyze -- the IRS has that.

17                   MR. GOULD:  Your Honor, the banking products

18      which were used as part of this scheme were intended for

19      individuals who did not have bank accounts.

09:33:51 20        So even if these individuals, the victims, did not

21      have bank accounts, they would have otherwise been eligible

22      to sign up in their names for those banking products at the

23      check cashing business and be assigned a routing and account

24      number for use on the tax return.

09:34:07 25                   THE COURT:  Maybe -- I'm not sure what you

1  were saying, but I thought you just said that some of these

2  taxpayers in paragraph 25 had bank accounts that were used

3  for at least the first year.

4      Were there -- were --

09:34:33  5      MR. BENNETT:  Your Honor, I would have to

6  agree with that.

7      THE COURT:  Were there individuals that had

8  the refunds sent directly to their bank accounts in the

9  first years?

09:34:44  10      MR. BENNETT:  The one individual that we had

11  was a Marie Hawkins that had a JPMorgan Chase Bank account.

12  All the rest were what was comes up as MetaBank, which was

13  the -- oh, there's also a Doreen -- and the rest came up as

14  MetaBank, which is the check cashing card that they had

09:35:08  15  signed up for and had --

16      THE COURT:  So who had bank -- who had

17  accounts, personal accounts that received the opening

18  refund?

19      MR. BENNETT:  I -- like I said, Your Honor,

09:35:25  20  the only one that we have based on our records that has a

21  legitimate bank account, and I'd have to go back and look at

22  her MOI to know for certain if she's the one who told us

23  this, but we had a Marie Hawkins, which is listed -- I think

24  that's the same M.H. that's listed in paragraph 25.

09:35:43  25      All the rest were -- that we charged were the check

1    cashing cards, Your Honor.

2                    THE COURT:  So for Marie Hawkins, she receives

3    a check of $6,502.

4         Where did that go to?

09:36:04  5                    MR. BENNETT:  It went to a JPMorgan Chase

6    account.

7                    THE COURT:  The first one or the second one or

8    both?

9                    MR. BENNETT:  Your Honor, that would have been

09:36:17 10    for the -- we have it listed here as the 2012 return,

11    received date of 12-20-2012, Your Honor.

12                    THE COURT:  I'm sorry.  My chart doesn't show

13    the date.  I'm looking at 25.  About halfway down the first

14    page of the chart, there's an M.H. listed as receiving

09:36:41 15    $6,372.

16                         (Pause in Proceedings)

17                    MR. BENNETT:  Your Honor, we have looked at

18    it, and based on what we have, the amount that's in the

19    chart, the 6,372, was a subsequent year, in 2014, and that

09:37:30 20    did go through the MetaBank check cashing card.

21         When we interviewed her, she did state that she

22    provided Woods with a bank account number at one point, but

23    then had also received the money in cash from Mr. -- from

24    Ms. Woods who showed up with what she described as a skinny

09:37:55 25    male.

1          THE COURT:  So on the second page, M.H. is

2     listed as receiving $6,502.

3                    (Pause in Proceedings)

4          MR. BENNETT:  Your Honor, that is what we have

09:38:27  5     on our chart that I mentioned earlier for the 2012 tax

6     return.

7          THE COURT:  So that was the first tax return?

8          MR. BENNETT:  Yes, Your Honor.

9          THE COURT:  And is that the one that you say

09:38:40 10    went through the bank account?  Or it was paid to the bank

11    account?

12         MR. BENNETT:  It went to a JPMorgan Chase

13    account, Your Honor, yes.

14         THE COURT:  Okay.  Why -- Mr. Thompson, why

09:38:56 15    would that be?  On the 2012, why would she have sent one

16    through the Chase account and one through this card account?

17         MR. THOMPSON:  I -- I don't know.

18       Ms. Woods, please.

19         THE DEFENDANT:  I can't say definitely the

09:39:19 20    reason of why, because they just threw this up at me.  I

21    didn't have -- I don't have any of the documents.

22       I believe she might have gotten fired from her job

23    where she was working at, or either they closed her account

24    up, I -- I don't know, because I didn't -- I'm not prepared

09:39:35 25    for that person.

1          THE COURT:  Okay.  Do you have any other

2     argument on the objection?

3               MR. THOMPSON:  No, Your Honor.

4          THE COURT:  Okay.  I'm going to overrule the

09:39:47 5     objection.  I think the circumstantial evidence supports the

6     inference that some of these identities were used without

7     authorization at least in the subsequent years.

8          I think there's really no reason why the monies would

9     have flowed through a third party if the persons had given

09:40:11 10    authorization for the use of their identities in the

11    subsequent years.

12         And so, I think the preponderance of the evidence

13    supports the two-level enhancement.

14         Do you have any other objection?

09:40:28 15              MR. THOMPSON:  No, Your Honor.

16              THE COURT:  I seek to impose a sentence that's

17    sufficient but not longer than needed.

18         In doing that, I first consider the guideline

19    calculations.

09:40:40 20         I set the base offense level at six.

21         I find the intended loss was $128,631.  I add eight

22    levels.

23         Two levels are additionally added because there was

24    the unlawful use of an identification to carry out this tax

09:41:04 25    fraud.

1          The adjusted offense level is 16.

2          The defendant gets a three-level reduction for

3     acceptance of responsibility.

4          The total offense level comes in at 13.

09:41:16  5          She has one criminal history point and comes out at a

6     criminal history category of I.

7          Having made those findings, does the United States

8     have any argument before sentence?

9               MR. BENNETT:  Your Honor, only that, first, it

09:41:37 10    was my understanding that Ms. Woods had a criminal history

11    of II based on paragraph 47 of the presentence report.  I

12    just clarify that on the record.

13          With regard to Ms. Woods in general, however, the

14    Court would --

09:41:56 15              THE COURT:  I'm looking -- maybe I'm looking

16    at the revised.  I'm looking at paragraph 7.

17              MR. THOMPSON:  Your Honor, there was a --

18              THE COURT:  The criminal conviction above

19    results in a subtotal criminal history score of one.

09:42:09 20              MR. THOMPSON:  Your Honor, just -- the final

21    page of the presentence report, or the objections portion of

22    it, page 19 of the PSR references an objection to the

23    addition of two criminal history points because she was on

24    probation for an offense at the --

09:42:33 25              THE COURT:  Let me ask the probation officer:

1    In paragraph 47, did you score her as one criminal history

2    point?

3                    PROBATION OFFICER:  That's correct, Your

4    Honor.

5                    THE COURT:  Okay.  I'll overrule what I

6    understand to be a Government objection that it should be

7    II.

8        Do you have any other argument?

9                    MR. BENNETT:  Only, again, Your Honor, I know

10   the Court has made its opinion known, but for the record, we

11   would ask the Court to abide by the plea agreement.  We

12   would ask that a --

13                   THE COURT:  Why didn't you have an 11(c)(1)(C)

14   then?

15                   MR. BENNETT:  I could have, Your Honor.

16                   THE COURT:  I mean, why did you --

17                   MR. BENNETT:  I didn't know if this Court

18   would accept a (C) agreement.

19                   THE COURT:  Well, maybe not.  But then she

20   could go to trial.

21                   MR. BENNETT:  The Court has asked me for

22   argument on whether or not the sentence -- on the sentencing

23   range that's there, and I, on behalf of the United States,

24   am asking the Court to impose a sentence within the

25   guideline range contemplated by the parties, which would be

1    12 to 18 months.

2         So we do believe a period of incarceration is

3    appropriate.  We would ask the Court to sentence within that

4    guideline range.

09:43:32  5         Thank you, Your Honor.

6              THE COURT:  Okay.  Do you have any argument,

7    Mr. Thompson?

8              MR. THOMPSON:  Yeah.  Just to note, first,

9    that I believe the plea agreement contemplated a range of

09:43:45 10    five to ten, I believe, if I'm not mistaken.  That was the

11    point of the objection.

12              THE COURT:  Yeah.

13              MR. THOMPSON:  Having said that --

14              THE COURT:  I think you're right.

09:43:54 15              MR. THOMPSON:  Having said that, Your Honor,

16    we ask for lenience for Ms. Woods.

17         As you can see from her personal history, she came

18    from a very difficult childhood.

19         Despite her conduct in this case --

09:44:10 20              THE COURT:  Well, what about -- I mean, the

21    thing that kind of jumps out is the longevity of it in this.

22    I mean, this -- this took place over a large number of

23    years, involved a lot of distinct acts.  It wasn't a onetime

24    event.  It was, you know, involving 20, 30 filings.

09:44:32 25              MR. THOMPSON:  Sure.  I do think that that is

1    also reflected in the dollar amount, Your Honor.

2        I don't know that -- also considering that it was, you

3    know, that it took place over a couple years is -- it's

4    obviously not technically double counting, but I do think

09:44:51  5    it's already reflected in the guideline calculation.

6            THE COURT:  And she's working all this time,

7    right?

8            MR. THOMPSON:  Yes, Your Honor.

9            THE COURT:  And she's got, you know, a

09:45:00 10    moderately good income, so --

11            MR. THOMPSON:  Yes.  And one of the 3553(a)

12    factors is the need to make restitution to the victims, and

13    I would urge Your Honor to take that into consideration and

14    know that whatever time Your Honor chooses to allow Ms.

09:45:13 15    Woods to serve a sentence in the community, she's going to

16    be working and she's going to be collectible.

17        With that, I would ask for lenience.

18            THE COURT:  Well, I mean, but isn't the

19    dominating factor the -- kind of the blameworthiness and the

09:45:30 20    need to impose just punishment?

21            MR. THOMPSON:  I think --

22            THE COURT:  Isn't that the dominate purpose

23    under 3553?

24            MR. THOMPSON:  My -- I'm not certain what --

09:45:45 25            THE COURT:  I mean, rehabilitation and

1    restitution and incapacitation are all factors, but --

2                    MR. THOMPSON:  Right.

3                    THE COURT:  -- then the guidelines and the

4    federal sentencing scheme kind of prioritize just

09:45:58  5    punishment.

6                    MR. THOMPSON:  Your Honor, I -- my only

7    hesitation is that the statute doesn't indicate that any one

8    factor is to be given more -- more power or more weight than

9    any other.

09:46:10 10                    THE COURT:  Well, it talks about impose just

11    punishment, reflect the seriousness of the offense.

12                    MR. THOMPSON:  Sure.

13                    THE COURT:  Improve offender conduct also.

14                    MR. THOMPSON:  True.  True.

09:46:19 15        And I would ask Your Honor to consider whether the --

16    you know, that in terms of demonstrating the seriousness of

17    the conduct, imposing a just punishment, improving her

18    conduct going forward --

19                    THE COURT:  That --

09:46:38 20                    MR. THOMPSON:  -- noting the fact that she is

21    employed and has been employed and obviously will be

22    employed for any time in the community, I think also goes to

23    those factors as well.

24        There's one factor specifically indicating the need

09:46:49 25    for restitution that I think it nicely dovetails into, but

1    defendant's history and circumstances, yeah, the fact that

2    she's gainfully employed and has been and, you know, is

3    obviously ready, willing, and able to begin making

4    restitution payments; I mean, she's about to be collected

09:47:06  5    upon, so I think that goes to that as well.

6         I think, also --

7              THE COURT:  From the -- from the --

8              MR. THOMPSON:  I would also ask --

9              THE COURT:  From the Government, what are the

09:47:16 10    years of these?  The tax returns were 2012, but were there

11    any before that?

12              MR. BENNETT:  Not that we charged.  I can ask

13    the agent.  We looked at those.  But they went from --

14              THE COURT:  Okay.

09:47:31 15              MR. BENNETT:  So it went from 2011 through

16    2015, Your Honor.

17              THE COURT:  Okay.  I mean, the one thing that

18    kind of jumped out a little bit was the 2011 Jaguar

19    automobile in terms of whether she was using some of the

09:47:47 20    proceeds to buy a fancy automobile.

21         Maybe.  Maybe not.

22              MR. THOMPSON:  She indicates she purchased

23    that car in 2009, Your Honor.

24              THE COURT:  That's kind of hard to do if it's

09:47:59 25    a 2011 Jaguar.

34

```
 1              MR. THOMPSON:  Is this the same car you're

 2   talking about?

 3                   (Pause in Proceedings)

 4              MR. THOMPSON:  I don't know, Your Honor.  I

 5   don't know about the Jaguar.

 6              THE COURT:  Okay.  Anything you want to say,

 7   ma'am?

 8              THE DEFENDANT:  Yes, Your Honor.

 9        I accept responsibility for every part that I played

10   in this.

11        I have always been gainfully employed.  You know,

12   they're saying that they're victims and I stole money from

13   them, which --

14              THE COURT:  I'm sorry?

15              THE DEFENDANT:  You know, some of the tax --

16              THE COURT:  I'm just asking if you can get

17   just a little closer to the microphone.

18              THE DEFENDANT:  Okay.  Yes, Your Honor.

19        I accept full responsibility for the part that I

20   played in this.

21        They're stating that I stole money from them, you

22   know, I -- so I --

23                   (Pause in Proceedings)

24              THE DEFENDANT:  I'm never going to do anything

25   like this again.  You know, I apologize for all of this.
```

09:48:13 (line 5)
09:48:26 (line 10)
09:48:39 (line 15)
09:48:51 (line 20)
09:49:06 (line 25)

1                    THE COURT:  Okay.  I --

2                    THE DEFENDANT:  Oh, I'm sorry, Your Honor.

3          I've currently been employed for ten years in the

4     current position that I'm currently doing for ten years.  I

09:49:29  5     do outreach work.  I work throughout the state of Ohio.  I

6     have numerous employees.  I've never been reprimanded at my

7     job.  The owner of the company actually wrote a written

8     letter in my defense.

9          I made a mistake.  I apologize for this.  I just want

09:49:46  10    to put all this behind me.  I'm willing to pay back the

11    restitution.

12          You know, the owner of the company is saying, you

13    know, he's willing to give me other opportunities where I

14    can make more money and just put all this behind me so I can

09:49:59  15    just move further and go on in my life.

16          I'm a matriarch to my family.  I'm a good mother.  I'm

17    a good daughter.  I'm a good sister.  And I just made a

18    mistake.  I just made a bad choice.

19                    THE COURT:  Okay.  The offense level has been

09:50:17  20    set at 13 and the criminal history category at I.

21          I also considered the 3553 factors.

22          First among those is the nature of the offense, and I

23    appreciate your comments, but you said -- you described it

24    as making a mistake.  But it really was a long series of

09:50:45  25    mistakes that ran between January 2012 through February of

1    2016, so -- and it involved a fairly involved and fairly

2    thought-out plan to defraud the United States by submitting

3    false tax returns claiming refund monies as to which the

4    claimants were not entitled.

09:51:16   5         You seem to have set this up with, you know, a

6    knowledge as to what would apparently work and especially

7    using this individual employment tax as a way to try to

8    obtain these additional refunds.

9         Both you and the co-defendant prepared and filed

09:51:42  10    individual tax returns.  You didn't sign either of those, so

11    you really weren't acting as a tax preparer.  Instead, it

12    appears that you solicited people to allow you to use -- in

13    some ways, to use their ID and set up a system that would

14    game the federal government.  It ultimately resulted in a

09:52:06  15    significant amount of loss, over $125,000, and it did extend

16    over a large number of years.

17         It appears that you received the broad, broad majority

18    of the monies that were fraudulently taken.  There were

19    prepaid debit cards which also I think supports the notion

09:52:32  20    that you didn't have authority for every year.

21         So the nature of the offense, the things that stand

22    out most are just the length of the fraud, so it took place

23    over a large number of years.

24         And in terms of the blameworthiness, you were in

09:53:02  25    circumstances where you had a relatively good income during

1    the times that you were carrying out this fraud, which I

2    think all makes it more blameworthy.

3         The total loss and the total restitution is about

4    128,000.

09:53:20  5    I also consider your own history and characteristics.

6    You've got some long ago conviction for theft, forgery,

7    vandalism, and obstruction.  Although, those don't really

8    play into it.  Otherwise, your criminal record is

9    relatively -- or is actually good.

09:53:45  10    You also have a longtime employment.

11        It also appears that you had a stable upbringing,

12    which works against you to some degree.  It appears that you

13    had both a supportive mother and supportive siblings.  It

14    appeared that you had a good family circumstance growing up.

09:54:06  15    You also have a good education, and it appears that

16    you're a bright young woman that has been successful in

17    other fields.

18        There's no history of substance abuse or mental health

19    issues, and those both help you.

09:54:26  20    I also considered the need for the sentence to reflect

21    just punishment, afford adequate deterrence, protect the

22    public, and reflect the seriousness of the offense.

23        I also considered the issue of disparities and

24    restitution.

09:54:46  25    So having considered all these factors, and consistent

1    I believe with the Sentencing Reform Act, I'm going to

2    sentence you to a lower-level guideline sentence of one year

3    and one day.

4        I'll also then impose, after your release from

09:55:09  5    incarceration, a term of supervised release of three years.

6        You'll need to report for that within 72 hours after

7    your release from custody.

8        You'll need to report to the Probation Office nearest

9    the location as to which you're released.

09:55:25  10        I'll waive the imposition of a fine.

11        I'll impose a $100 special assessment.

12        I'll also impose a restitution order in the amount of

13    $128,631, which will be joint and several with your

14    co-defendant.

09:55:45  15        During any incarceration, you'll have to pay at least

16    25 percent of any income you receive.  After release from

17    incarceration, you'll be required to pay at least 10 percent

18    of any income, gross monthly income that you receive.

19        You'll be under the standard conditions.

09:56:06  20        I'll suspend the drug testing.  It doesn't appear that

21    you have any drug or alcohol issues.

22        During the supervised release, you'll have to give

23    financial disclosure to the probation officer.

24        You'll also be forbidden from opening any new credit

09:56:26  25    charges or lines of credit unless you've gotten prior

1   approval.

2        You'll also be, during the supervised release,

3   required to cooperate with the IRS in terms of filing any

4   delinquent or amended tax returns.

09:56:43 5        I'll also require, finally, that -- well, two things.

6   You'll have to consent to a search of your person,

7   residence, place of business, vehicle, or computer during

8   the supervised release if the probation officer reasonably

9   suspects a violation of the -- of the supervised release.

09:57:04 10        Finally, if you come into any financial windfall by

11  way of legitimate tax returns or other monies, you'll be

12  required to apply that first to the restitution order.

13        You'll be given credit for any time you've already

14  served.

09:57:24 15        I'll allow you to self-report.  The way this will work

16  will be the Bureau of Prisons will give you a notice of a

17  time and place to report.  Follow whatever directions they

18  give relative to that.

19        But if for some reason that falls through the cracks,

09:57:47 20  I'll require that you appear at the Marshals' Office on

21  July 29th, 2019 at 12 -- by 12:00 noon.

22        So, once again, if the Bureau of Prisons gives you an

23  earlier report date or a later report date, follow whatever

24  directions they give, but if you don't get any directions

09:58:14 25  from them, make sure you appear at the Marshals' Office by

1    12:00 noon on that day.

2          So does the defense have any objection?

3                  MR. THOMPSON:  Yes, Your Honor.

4          In addition to the -- the two-level enhancement

09:58:32 5    objection previously noted and discussed, Your Honor

6    indicated, in citing the facts in support of Your Honor's

7    sentence, that Ms. Woods had a -- I believe a stable

8    upbringing.

9          I would just note for the record that her father moved

09:58:53 10   to California when he -- when she was 10.

11                 THE COURT:  And he was a police officer,

12    right?

13                 MR. THOMPSON:  Right.

14                 THE COURT:  And so, he was in her life, but

09:59:01 15   not much, right?

16                 MR. THOMPSON:  No.  She -- he was no longer

17    involved and her -- the stepfather who came into the picture

18    did physically abuse her mother and her mother was murdered

19    when she was 18, so --

09:59:15 20                THE COURT:  You're correct.

21                 MR. THOMPSON:  I just don't --

22                 THE COURT:  That -- and I did see that.  And

23    I -- you're correct.  I was referring to earlier times.  And

24    I -- paragraph 52 indicates in the final two lines:  Ms.

09:59:45 25   Woods stated that she grew up in a stable environment and

1    she was not subjected to any abuse or neglect.

2                    MR. THOMPSON:  Right.  I just think that --

3    just for the Court's consideration, I just -- I -- my

4    definition of stable is a little different.

10:00:16  5                    THE COURT:  And I did see in paragraph 53 of

6    the tragic murder of her mother, and it appears that no one

7    was ever arrested for that.

8                    MR. THOMPSON:  No, Your Honor.

9        She found this out on the television too, that was my

10:00:29  10   understanding.

11                   THE COURT:  Okay.  Any other objections?

12                   MR. THOMPSON:  No, Your Honor.

13                   THE COURT:  Does the United States have any

14   objection?

10:00:36  15                  MR. BENNETT:  No, Your Honor.

16                   THE COURT:  So you may have some right to

17   appeal this, ma'am.  If you wanted to appeal and didn't have

18   enough money to pay for it, you'd have a right to have

19   counsel appointed to represent you.

10:00:52  20       I'd ask, Mr. Thompson, that you speak with your client

21   about that, and if she wants to try and appeal, I'd ask you

22   to see that it become timely filed.  If there's any belief

23   that other counsel should represent her on an appeal, bring

24   that to the Court's attention by motion.

10:01:12  25       Okay?

1          MR. THOMPSON:  Yes, Your Honor.

2              THE COURT:  Thank you.

3          And we'll adjourn.

4          MR. BENNETT:  Thank you, Your Honor.

10:01:25  5        THE COURT:  Do you move for the dismissal?

6          MR. BENNETT:  I mentioned it, Your Honor, but

7    I didn't officially move for it.

8          So, yes, the Government, pursuant to the plea

9    agreement, would move for the dismissal of Counts 2 through

10:01:36 10   9, Your Honor.

11             THE COURT:  And I'll grant that motion.

12             MR. BENNETT:  Thank you, Your Honor.

13                         - - -

14          (Proceedings concluded at 10:01 a.m.)

15

16

17

18                  **C E R T I F I C A T E**

19          I certify that the foregoing is a correct transcript
     of the record of proceedings in the above-entitled matter
20   prepared from my stenotype notes.

21          */s/ Sarah E. Nageotte*          *7/16/2019*
            SARAH E. NAGEOTTE, RDR, CRR, CRC          DATE
22

23

24

25